UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
JOE MICHAEL HYATT,
        Debtor.                              No. 11-11-10973 SA

## MEMORANDUM OPINION IN SUPPORT OF ORDER
## DENYING RELIEF UNDER  § 1112(b)

The Motion of Cornelius Dooley, M.D. and Susanne Hoffman-
Dooley ["Dooleys"} to Convert Debtor's Chapter 11 Case to One
Under Chapter 7 or, in the Alternative, to Dismiss Debtor's
Chapter 11 Bankruptcy (doc 59 – motion to convert; doc 63 –
motion to dismiss) ("Motion"), and the objections thereto filed
by creditors New Mexico Bank & Trust (doc 64), Farm Credit of New
Mexico, FLCA (doc 65), Christie B. Cochrell (doc 66), and Debtor
in Possession Joe Michael Hyatt (doc 68), came before the Court
for trial on July 25, July 31 and August 2, 2012 (minutes – doc
116).  The Court denies the Motion and instead sets a deadline
for Debtor to file and notice out an amended plan and disclosure
statement.[1]

**Background**

On or about October 15, 2010, HDQ, LLC obtained a judgment
in the amount of $1,835,107 following a jury trial in the First
Judicial District Court, County of Santa Fe, State of New Mexico.
The judgment was against Debtor and Quiet Title Company, LLC

_____

[1] The Court has subject matter and personal jurisdiction
pursuant to 28 U.S.C. §§ 1334 and 157(b); this is a core
proceeding pursuant to 28 U.S.C. § 157(b)(2)(A); and these are
findings of fact and conclusions of law as may be required by
Rule 7052 F.R.B.P.

("Quiet Title"), of which Debtor was both employee and manager. As of the date of the filing of the petition, the Dooleys assert the amount owed on the judgment was $1,944,458.75.[2]  Debtor and Quiet Title perfected an appeal which is now pending before the New Mexico Court of Appeals.  It is not clear when the Court of Appeals will issue a decision, but it appears likely that it will be sometime between February and June 2013.[3]

Promptly after entry of the judgment, in the absence of a supersedeas bond, HDQ[4] initiated collection actions.  See Debtor exhibits (H - for "Hyatt"] 3 - 6.  On March 9, Debtor and Quiet Title (No. 11-10978-s11) each filed chapter 11 petitions.  The filing of the bankruptcy petition resulted in an almost complete loss of business for Quiet Title, a real estate title company.

---

[2] Debtor listed the amount of the claim in the lesser amount in his schedule F (doc 1, at 20 of 40).  In theory, these two numbers should be the same.  However, for purposes of this opinion, the precise amount is not important, only the relative magnitude of the judgment.

[3] See Exhibit A attached to Motion (transcript of hearing in Adversary Proceeding 11-1095, doc 59-1), at 3 of 4 (six to nine months following the completion of briefing, but as of November 28, 2011, briefing had apparently not commenced).  See also Debtor exhibit [H - for "Hyatt"] 10 (opening brief with a file date of June 7, 2012).  During closing arguments, Debtor's counsel informed the Court that, following an extension of time granted to Dooleys for filing their response brief, Debtor's reply brief would likely be filed sometime in August.

[4] HDQ is an LLC, one of whose members is Cornelius Dooley, M.D.

Page 2 of  41

Its chapter 11 case ended with a stipulated dismissal entered on July 18, 2011.  No. 11-10978-s11, doc 95.

Prior to the sudden loss of business by Quiet Title, Debtor received a substantial annual salary from Quiet Title: $120,000 (gross) in 2009, $130,000 in 2010, and apparently on track for $150,00 in 2011.  Statement of Financial Affairs, no. 1.  Doc 1, at 29 of 40.  Faced with the unexpected loss of his primary business activity, and with (more than) a little help from his friends, Debtor reconstituted the title business under the name of Prima Title, LLC, and continues his primary business activity running a title company.  He has also continued to manage a number of mostly interrelated companies in such a way that the aggregate net value of the companies' assets is continuing to grow.

Debtor filed his schedules, statement of financial affairs, and numerous other documents timely.  He attended the first meeting of creditors (§ 341 meeting), which the United States Trustee concluded at the end of the meeting.  Debtor also, <u>inter alia</u>, obtained Court approval for various professionals (Mr. Gramer as chapter 11 counsel, Ms. Lorenz as special counsel for the state court appeal, Mr. Dickey as accountant for the estate); engaged the Dooleys in claim litigation; filed monthly operating

reports ("MORs")[5]; amended his schedules B and C (docs 100 and 101 respectively); and obtained a modification of the stay to permit the state court appeal process to go forward (motion filed July 11 – doc 34; default order entered August 22, 2011 – doc 50).

And Debtor filed a chapter 11 plan and disclosure statement on July 7, 2011, the deadline for filing a plan and disclosure statement to avoid losing the benefit of the exclusivity period provided by § 1121(b). Docs 32 and 33. He did not, however, take any action to obtain approval of the disclosure statement or to obtain confirmation of the plan. Nor has he filed a substitute plan and disclosure statement, even at this late date.

At trial, three creditors supported Debtor in resisting the Motion. One was Christie Cochrell ("Cochrell"), personal representative of the estate of June Cochrell, owed $92,700 on a 2005 note. Proof of claim no. 8. Debtor and that creditor appear to have reached an accommodation that has Debtor paying interest but relatively little principle each year. Another was New Mexico Bank & Trust ("NMBT"), which holds a mortgage on Debtor's home in Tesuque, New Mexico, as well as a deed of trust

_____

[5] Debtor is largely current on his MOR's, lacking only the one for August 2012. The MORs also appear to lack the cumulative running monthly totals. Debtor explained he had not been asked to prepare that part of the MORs. There was no explanation about why counsel signed off on the MORs without that part completed. At a minimum, on a going-forward basis, the MORs must be complete when filed.

on the Plaza Rojo [sic] house.  According to Schedules A and D (doc 1), the first mortgage on the Tesuque property of about $1,200,000 is fully secured by the property worth $1,300,000. The Plaza Rojo numbers are considerably smaller: a $154,000 mortgage secured by collateral worth $190,000.[6]  Debtor has also guarantied to NMBT debts of Trestle Ranch Corporation ("Trestle") and Poohbah Corporation ("Poohbah") in the amounts of $130,00 and $190,000 respectively.  Third was Farm Credit of New Mexico, FLCA ("Farm Credit"), which has a note for what Farm Credit says is a debt of about $2,528,000 (Proof fo Claim No. 9)and Debtor says is a debt of $2,666,000.  Farm Credit and Debtor both agree the note is fully collateralized by the Trestle land and improvements, which Farm Credit values at $3,982,000.  Farm Credit asserts it is worried about a decrease in value of the collateral such that it might in the future find itself needing to call on Debtor's guaranty of the Trestle debt.

**Analysis**

As noted, on January 23, 2012, Dooleys filed their motion to convert the chapter 11 case to a case under chapter 7 (their preference) or to dismiss the chapter 11 case.  In closing

---

[6] Both of these properties are located in Santa Fe County and subject to junior liens arising from HDQ's transcript of judgment.  Doc 1 (schedules A and D).  The Court is relying on Debtor's schedules since NMBT has not filed a proof of claim.

argument, Dooleys' counsel also offered the alternatives of the appointment of a chapter 11 trustee or an examiner.

Dooleys in the Motion and in the course of the trial alleged the following to be the bases for the Motion:

1. Substantial and continuing losses to, and diminution of, the estate, and there is no reasonable likelihood of rehabilitation[7];

2. Gross mismanagement of the estate (through the transfers among various entities and extravagant, lavish and/or exorbitant lifestyle and spending);

3. Failure to confirm a plan within the time fixed by the Bankruptcy Code and inability to feasibly [sic] confirm the plan on file;

4. Case filed in bad faith because this is a two-party dispute and the Bankruptcy Court is an improper venue for such dispute;

5. Filing the case in bad faith in attempting to use a chapter 11 filing in lieu of posting a supersedeas bond in the state court action; and

6. Not moving toward confirmation of a plan.[8]

---

[7] Sic in the Motion (at 1). The Court will treat this allegation as if it were worded identically with the corresponding language in the statute at § 1112(b)(4)(A), which is set out below.

[8] In the Motion, Dooleys also charged that Debtor was acting
(continued...)

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 6 of 41

Congress significantly amended § 1112 when it passed the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), and then again when it passed the Bankruptcy Technical Corrections Act of 2010 ("Technical Corrections Act")[9]. The statute, including the applicable parts of § 1112(b), now reads as it did on the petition date, as follows:

> Conversion or dismissal
> (b)(1) Except as provided in paragraph (2) and subsection ( c ) [prohibiting conversion of farmers' or eleemosynary entities' cases to chapter 7 cases], on request of a party in interest, and after notice and a hearing, the court shall convert a case under this

---

[8](...continued) in bad faith in this and in the related chapter 11 filing of Quiet Title, but made that specific allegation without a further specification of behavior. "Lack of good faith is atypical conduct that constitutes an abuse of the bankruptcy process." In re Costa Bonita Beach Resort, Inc., 2012 WL 3716842 (Bankr. D.P.R. 2012) at *18 (citing Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 375 n. 11 (2007) ("We have no occasion here to articulate with precision what conduct qualifies as 'bad faith' sufficient to permit a bankruptcy judge to dismiss a Chapter 13 case or to deny conversion from Chapter 7. It suffices to emphasize that the debtor's conduct must, in fact, be atypical."). Not specifying the conduct that allegedly constitutes the bad faith essentially makes the allegation meaningless.

[9] Pub. L. No. 111-327, 124 Stat. 3557 (December 22, 2010). Whether the changes enacted by the Technical Corrections Act to § 1112 (other than the change of "521" to "521(a)") was much more substantive than merely technical is less than debatable. In re Ashley Oaks Development Corp., 458 B.R. 280, 284 n.7 (Bankr. D.S.C. 2011). But it makes little difference for purposes of this decision since this chapter 11 case was filed after the effective date of the Technical Corrections Act, thus not raising the issue of the retroactivity of the statute. See In re Sparkle Stor - All Eaton Township, LLC, 2011 WL 4542709 (Bankr. N.D. Ohio 2011) at *3 and note 2.

chapter to a case under chapter 7 or dismiss a case
under this chapter, whichever is in the best interests
of creditors and the estate, for cause unless the court
determines that the appointment under section 1104(a)
of a trustee or an examiner is in the best interests of
creditors and the estate.
(2) The court may not convert a case under this chapter
to a case under chapter 7 or dismiss a case under this
chapter if the court finds and specifically identifies
unusual circumstances establishing that converting or
dismissing the case is not in the best interests of
creditors and the estate, and the debtor or any other
party in interest establishes that--
  (A) there is a reasonable likelihood that a plan
will be confirmed within the timeframes established in
sections 1121(e) and 1129(e) of this title, or if such
sections do not apply, within a reasonable period of
time; and
  (B) the grounds for converting or dismissing the
case include an act or omission of the debtor other
than under paragraph (4)(A)--
   (i) for which there exists a reasonable
   justification for the act or omission; and
   (ii) that will be cured within a reasonable
period of time fixed by the court.
(3). . ..
(4) For purposes of this subsection, the term 'cause'
includes--
  (A) substantial or continuing loss to or
diminution of the estate and the absence of a
reasonable likelihood of rehabilitation;
  (B) gross mismanagement of the estate;
  . . .
  (J) failure to file a disclosure statement, or to
file or confirm a plan, within the time fixed by this
title or by order of the court. . . .

Most of the examples of "cause" cited in the statute are on

their face not applicable in this case (and therefore not set out

above).  On the other hand, the term "includes" that leads off §

1112(b)(4) means that there can be bases for relief other than

those specifically identified in that subsection.  See § 102(3);

e.g., In re Alton Telegraph Printing Co., 14 B.R. 238, 240

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 8 of 41

(Bankr. S.D. Ill. 1981); <u>Orbit Petroleum</u>, 395 B.R. 145, 147-48
(Bankr. D. N.M. 2008); <u>In re Borges</u>, 440 B.R. 551, 560 (Bankr.
D.N.M. 2010) (citing <u>Orbit Petroleum</u>); 7 Alan N. Resnik <u>et al.</u>,
<u>Collier on Bankruptcy</u> ¶ 1112.04[4] (16th ed. 2011).  The
allegations of bad faith based on this being a two-party dispute
and the use of a chapter 11 filing in lieu of a supersedeas bond
are examples of the latter.

> [T]he movant bears the initial burden of demonstrating
> that cause exists to convert the chapter 11 case to
> chapter 7, or to dismiss the case, whichever is in the
> best interst of creditors and estate.  If cause is
> established and unusual circumstances of application of
> section 1104(a) are not found by the court, the statute
> requires conversion to chapter 7 or dismissal of the
> case.  Thus, until the movant carries this burden, the
> statutory direction that the court "shall convert the
> case to a case under chapter 7 or dismiss the case" is
> not operative.

<u>Id.</u> (footnotes omitted).  <u>Accord</u>, <u>e.g.</u>, <u>In re Muskogee
Environmental Conservation Company</u>, 236 B.R. 57, 59 (Bankr. N.D.
Okla. 1999) (movant bears initial burden to establish cause by
preponderance of the evidence); <u>In re Hospital de Damas, Inc.</u>,
2012 WL 1190651 (Bankr. D. P.R. 2012) at *3 (same); <u>In re
Colbran, LLC</u>, 2012 WL 2803726 (Bankr. D. Mass. 2012) at *3
(Technical Corrections Act did not change burdens).

1.  <u>Substantial and continuing loss to or diminution of the
    estate and there is no reasonable likelihood of
    rehabilitation:</u>

The most obvious reason why the Motion fails on this ground
is that Debtor has financially rehabilitated himself.

"Rehabilitation means to reestablish a business." In re Brutsche, 2012 WL 3150353 (Bankr. D. N.M. 2012) *3 (citations omitted); accord, In re ARS Analytical, LLC, 433 B.R. 848, 862 (Bankr. D. N.M. 2010). Debtor has done that in spades.[10] He continues to manage the affairs of the various corporations, LLCs

---

[10] The Court is aware of its language in ARS Analytical, LLC, 433 B.R. at 862: "Rehabilitation in Chapter 11 starts with a confirmable plan." (Citing Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings, L.L.C. (In re Vallambrosa Holdings, L.L.C.), 419 B.R. 81, 89 (Bankr. S.D. Ga. 2009.) A more complete quotation from the Vallambrosa Holdings opinion is as follows:

    Nevertheless, rehabilitation in a Chapter 11 begins
    with a confirmable plan. It then requires, at minimum,
    the prospect of re-establishment of a business.
    I find that Debtor has not advanced a plan which is
    confirmable, even if Tucker does contemplate
    re-establishing Debtor as an operating company.

Id. (Citation omitted.) In applying § 1112(b)(4)(A), the court in Vallambrosa Holdings had already determined that on the petition date, debtor had sufficient equity in its real estate to pay the secured claim and the unsecured claims in full, but that almost a year later, it had lost almost all its equity and in addition had no cash to pay administrative claims. Id. at 88-89. It then found that there was simply no way the debtor could propose and confirm a plan that would allow the debtor to rescue its real estate development. Id. at 89-90. It was in this context that the court ruled that rehabilitation, which it defined as "the successful maintenance or re-establishment of the debtor's business operations", id. at 89, must start with a confirmable plan. Similarly, ARS Analytical had not re-established its business – it was continually losing money and could not even pay its administrative claims – nor could it propose a plan that would re-establish its business. ARS Analytical, LLC, 433 B.R. at 862-63. In the instant case, on the other hand, Mr. Hyatt has already re-established his business, and so the context of this case differs materially from the context of ARS Analytical and Vallambrosa Holdings, in which rehabilitation could only start with the confirmation of a plan. (The issue of a confirmable plan, of course, was and is of critical importance in all three cases.)

Page 10 of 41

and partnerships that he has been managing for years.  There is little difference between what he was doing with these entities and their property at almost any point before or after the filing.  Quiet Title did rather quickly go out of business, but Debtor barely missed a beat in resuming his management of a Santa Fe real estate title company – Prima Title – which essentially has the same employees, location and business of Quiet Title.  Dooleys cite this arrangement as evidence of bad faith, but that criticism in effect emphasizes how well the rehabilitation has been accomplished.

> To obtain relief under 11 U.S.C. § 1112(b)(4)(A), movant must show both a continuing loss or diminution and absence of a reasonable likelihood of rehabilitation.  In re Fall, 405 B.R. 863, 867 (Bankr. N.D. Ohio 2008), aff'd, 2009 WL 974538 (N.D. Ohio 2009); Vallambrosa Holdings, 419 B.R. at 88.

Id. (Emphasis added.)  Debtor's re-establishment of its business means that Dooleys have not proved the grounds for relief under § 1112(b)(4)(A).

It is also the case, though, that there have not been substantial and continuing losses to or diminution of the estate.  Debtor's management overall has resulted in the Evergreen Apartments being put into a profitable status for the first time ever and for the opportunity to purchase the apartments in 2015, the oil and gas properties restored to being a steady six-figure source of income (approximately $300,000 per year less NMBT payments), the Santa Fe storage condominiums now debt free (and

generating about $120,000 annual income), and the debts of
Poohbah to NMBT and of Trestle to Farm Credit and Legacy Bank
being paid down (thereby reducing Debtor's contingent liability).
Trestle is also repaying its preferential transfer to the estate.
Selling various assets, such as the ranch held by Trestle, would
generate a loss, and thus it is not unreasonable to continue to
hold the ranch, and indeed all the real estate, for appreciation
and, where applicable, income.  Similarly, the oil and gas
interests could be sold but there is really only one buyer for
them – the controlling party – so that holding the oil and gas
interests to continue collecting the revenue seems quite
reasonable[11].

2.    Gross mismanagement of the estate (through the transfers
      among various entities and extravagant spending):

     The allegation about the improper transfers was described by
Dooleys' counsel as "situational accounting" – obtaining assets
for and incurring debts by, and allocating or attributing those
assets and debts to, whatever corporation Debtor designates as
needed, but mainly Trestle and Poobah.  Dooleys cited this
conduct as the primary instance of mismanagement.  They also
argued that Debtor was living an extravagant lifestyle,
improperly supporting insiders, and using a major preference

---

[11] In any event, Debtor committed to sell the oil and gas
interests as needed.

recovery to sustain his too-high spending levels in the chapter 11 case.

Dooleys spent a considerable amount of time examining the assets and debts of, and the transactions among, Debtor and the several entities in which he has an interest. Those entities and Debtor's direct and indirect ownership shares are as follows (usefully summarized on charts provided by Dooleys): Maxwell Trust (debtor is the sole beneficiary) owns 85% of Prima Title (source of Debtor's earned income); Poohbah Corporation (100%); MaxMedical (Poohbah owns 100% of stock); JMH Racing (Poohbah owns 90%; 10% held by Jon M. Hyatt); Trestle Ranch Corporation (100%); Bison Investments, LLC (Debtor owns 25% and Trestle owns 25%); Evergreen Apartments (Debtor owns 50% and Evergreen Apartments, LLC owns 50%); Scottrade account (Trestle owns 100%); and (a now defunct) Quiet Title Co., LLC (Trestle owns 100%).

Dooleys' expert witness, Ms. Rachel Kefauver, presented evidence that was both precise and accurate, and eminently credible. She pointed out numerous accounting discrepancies in the records created over a period of years. But at the end of the day (metaphorically speaking), she did not say, nor did she purport to say, that she had discovered any fraud, any cover up, any other illegitimate activity or accounting or even any losses. The Court agrees that the accounting by Mr. Charles Dickey, the longtime accountant for Debtor and his companies, was less than

pristine, but the significant discrepancies were all easily explained.  At most an occasional lack of expertise and some sloppiness appear to have been the culprits.  There was certainly nothing in the evidence that pointed to cause for dismissal or conversion.  The Court also finds credible and persuasive Debtor's statement that over many years he has relied on the accounting and records of Mr. Dickey, including to do millions of dollars of transactions, and never had a problem.

The exhibits, particularly Dooley exhibit 57 (doc 111), and the testimony from the various witnesses (all of whom the Court finds were credible) allows the Court, without the need to detail the contents of the exhibits and the testimony, to make several findings.  First, Debtor has for years, and continuing through this chapter 11 case, managed the various companies' assets in such a way as to maximize the aggregate value of all the entities (including himself).  That effort included, indeed necessitated, a number of intercompany transactions and, in effect, notes payable/receivable among the entities (albeit the obligations were documented by check register entries, bank statements, and other records of receipts and disbursements rather than promissory notes as such).  This was what Dooleys' counsel characterized as "situational accounting".  Regardless of the deprecating terminology and Dooleys' overlooking the overall result, it is hard to find any fault with what appears to be

Debtor's patient and astute accumulation and nurturing of assets, both prepetition and postpetition.

Second, the accounting as provided by Mr. Dickey, and as supplemented by Mr. Dickey during his examination, was less than rigorously consistent with standard accounting procedures but easily sufficient to provide an accurate picture of the assets, liabilities and transactions of the entities. Third, there was no evidence whatever of any attempt to conceal or mischaracterize any asset, debt or transaction at any time, by Debtor or Mr. Dickey.

All of the Court's findings support the overarching conclusion that there was no evidence whatever of any bad faith on the part of Debtor, or his counsel, other than potentially the failure to file and confirm a plan (discussed below). Rather, the evidence overwhelmingly supports the conclusions that Debtor has for years, including during this chapter 11 case, worked diligently to manage the assets and grow the net value of the companies, and has carefully tracked all those transactions. Debtor (more accurately, the estate now) owns almost all the companies and their assets directly or indirectly, so the transfers do not represent any losses to the estate. And while if any one of the entities were to end up in bankruptcy, there might be issues of constructive fraudulent transfers, the fact is that using the various legal entities as Debtor has done does not

Case 11-10973-j7    Doc 122    Filed 09/26/12    Entered 09/26/12 16:03:36 Page 15 of 41

in any way constitute bad faith per se.  In consequence, the net effect of the evidence concerning the "situational accounting" is to demonstrate that Debtor from the outset conducted a sophisticated and successful asset management program in good faith.

Dooleys also argue that Debtor is living an extravagant life style.  Related to that are the claims that he is improperly supporting insiders and that the preference recovery which he has arranged from Trestle is being used for operations instead of being reserved for payment of creditors.  Debtor did not deny, and the MORs show, that he had been using the Trestle preference recovery as part of operations.  But by itself that practice is not improper.  Money is fungible, and whether these funds are used in operations while other funds are used to pay creditors, or vice versa, makes no difference.  Only if the preference recoveries are being improperly dissipated would it become an issue, but that is the case with any asset of the estate.

It is also the case that Debtor is supporting insiders, but not improperly.  First, Debtor is providing significant support for a disabled adult son, roughly averaging $2,000 monthly.  (To Dooleys' credit, at no time have they challenged those living and medication expenditures as improper.)  Debtor is also providing occasional support for his other adult son.  At the beginning of the case he was also providing support for his elderly mother,

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 16 of 41

but testified at trial that his sister had now taken over that responsibility. But there was no evidence that the support for those persons was extravagant or not necessary. And the mere fact that the recipients of Debtor's support were not minors or a current spouse does not automatically make the support improper. See In re Gonzales, 297 B.R. 143 (Bankr. D. N.M. 2003) (chapter 13 plan confirmed when Debtor was supporting his adult son who was unable to obtain steady employment).

Finally, Debtor's expenses are somewhat on the high side, but are legitimate enough to not constitute cause for dismissal or conversion. Debtor's residence in Tesuque, financially underwater, requires a monthly mortgage payment of approximately $7,800. The home is not in a condition to be sold in the current Santa Fe real estate market without sustaining a major loss – thereby increasing the unsecured debt of the estate -- and so at least for the time being it makes sense to continue to hold the property (and provide Debtor a place to live) in the hopes that an appreciation of real estate values in the Santa Fe area will take hold at some point over the next few years. However, even if one does not agree with this approach, the business decision not to sell an asset at a loss when it might be sold later without a loss, is not the sort of behavior that should lead to dismissal or conversion. Rather, it is a plan confirmation issue.

Another of the claims was that Debtor ate out almost every day. In part that would be expected for someone who runs a high-end service company that depends on the good will and business of many professionals in the community, particularly real estate agents. Nevertheless, the MORs show that the amounts spent on each meal mostly range from $8.00 to $15.00. Further, a number of the meals were purchased from McDonald's, Blake's (Lotaburger) and Wendy's (together with what appears to be a lot of coffee from McDonald's). Short of preparing a peanut butter and jelly sandwich every day (though this Court is certainly not denigrating the traditional PB&J, many of which this judge has consumed), it is hard to imagine how the amounts expended for those meals could be materially reduced.

Overall, excluding professional fees, Debtor's living and operating expenses range from about $12,000 to $15,500 per month.[12] Subtracting the mortgage and support for his son, together totaling a little under $10,000 per month, Debtor's remaining monthly expenses are $2,000 to $5,500. If a somewhat typical mortgage payment – say, $2,500 – is added to those net figures, the result is monthly expenses of $4,500 to $8,000 or, on an annualized basis, $54,000 to $96,000 per year. By New Mexico standards these figures are high, but not so much for

_____

[12] The December 2011 household expenses of $18,138 included almost $2500 for continuing legal education, legal malpractice insurance and realtor's errors and omissions insurance.

professionals.  In any event, the amounts being spent do not rise to the level of serving as a basis for dismissal or conversion. Rather, the level of expenses should be determined as part of the confirmation process.  See § 1129(a)(15)(B) (individual debtor's projected disposable income as defined in § 1325(b)(2) may be part of the confirmation requirements for an individual chapter 11 debtor).

3.    Failure to confirm a plan within the time fixed by the Bankruptcy Code and inability to feasibly confirm the plan on file:

As noted, Debtor filed a plan and accompanying disclosure statement on the 120th day following the filing of the chapter 11 petition.  He has not since then moved to obtain approval of the disclosure statement, nor confirmation of the plan.  And in fact, Debtor's discussion of an alternative plan in the course of trial is an admission that the plan on file cannot be confirmed. However, because the plan on file is not confirmable, does not mean that cause exists under § 1112(b)(4)(J) for dismissal or conversion.  That conclusion follows because Debtor still has time to file an amended plan, as he apparently intends to do.

Section 1112(b)(4)(J) is relatively explicit: "failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court."  First, with the exception of small business cases, there is no deadline as such provided by the Code or the rules (either the national

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 19 of 41

rules or this Court's local rules) for the filing of a chapter 11 plan. The 120-day period that is loosely albeit erroneously referred to as a "deadline" for filing a plan is really only a deadline in the sense that the debtor in possession's exclusivity right terminates unless the plan is filed within the 120 days or the court extends the exclusivity period. § 1121(b) and (c).

Second, the Code deadlines for filing and confirming a plan imposed on small business debtors by §§ 1121(e) and 1129(e) do not apply to Debtor. Debtor is not a small business as defined in § 101(51D). Debtor's petition states that explicitly, but also has checked off the box that says that "Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,343,300." Doc 1. Schedules D and F respectively show secured debt owed directly to non-insiders of approximately $3,256,000 and unsecured debt owed directly to non-insiders of about $90,000, for a total of $3,346,000, a million dollars more than the upper limit of debt that defines a small business. Apparently the box stating the amount of the debt was checked off in error.

Third, this Court has not ordered Debtor to file a plan, or an amended plan, at any time. HDQ or Dooleys could have filed its or their own plan, albeit such a plan would face substantial hurdles to get confirmed, and there likely would have been a major fight over the disclosure statement. Similarly, either of

these two creditors could have asked the Court to set a deadline to file a plan.  Neither of those events transpired.  In consequence, no cause exists under § 1112(b)(4)(J) for dismissal or conversion.

4.  <u>Case filed in bad faith because this is a two-party dispute and the Bankruptcy Court is an improper venue for such dispute;</u>

5.  <u>Filing the case in bad faith in attempting to use a chapter 11 filing in lieu of posting a supersedeas bond in the state court action;</u> and

6.  <u>Not moving toward confirmation of a plan.</u>

These three grounds are largely different aspects of the same argument, and so will be considered as a group.

First, there can be little dispute that this case is in fact largely a two-creditor dispute, which status can serve as a basis for a dismissal.  <u>See, e.g.</u>, <u>Muskogee Environmental Conservation Company</u>, 236 B.R. at 66-67; <u>City of Sioux City, Iowa v. Midland Marina, Inc. (In re Midland Marina, Inc.)</u>, 259 B.R. 683, 686 (8th Cir. BAP), <u>aff'd</u> 22 Fed.Appx 680, 2001 WL 1543940 (8th Cir. 2001) (dismissal of chapter 11 to allow marina owner to prosecute claims against city, which litigation was its primary asset; chapter 11 case was largely a two-party dispute between debtor and city); <u>In re 266 Washington Associates</u>, 141 B.R. 275, 288 (Bankr. E.D. N.Y. 1992) (single asset real estate chapter 11 case dismissed when stay modified and debtor could propose no confirmable plan that could be crammed down on secured creditor's

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 21 of 41

deficiency claim; other creditors were minor creditors caught up on the petition date); In re Paolini, 312 B.R. 295, 307 (Bankr. E.D. Va. 2004) (listing cases) (two-party dispute in which debtor filed to avoid collection efforts as it appealed judgment; trial court had denied debtor's request for a stay pending appeal without filing a supersedeas bond; debtor exhibited no serious effort to reorganize finances and filed a plan which sought to avoid payment of the judgment, debtor's spouse was dissipating assets, etc.); In re Sydnor, 431 B.R. 584, 594, 596 (Bankr. D. Md. 2010) (inquiry about lack of good faith includes not only whether case was filed to avoid posting of supersedeas bond but also whether case is essentially two-party dispute, whether debtor intends to relitigate the prior action, and whether debtor has an ongoing business that can be reorganized; case dismissed); c.f., Harker v. United States, 112 F.3d 513 (8th Cir. 1997) (unpublished) (chapter 13 petition filed to avoid assessment by IRS, which was the only creditor and which potentially had a nondischargeable, priority claim); In re Shady Grove Tech Cener Associates Limited Partnership, 216 B.R. 386, 391-92 (Bankr. D. Md. 1998) (chapter 11 single asset real estate case was essentially a two-party dispute in which a plan was not confirmable; stay relief granted).  The lack of any pressure from any of the other creditors before or during this chapter 11 case helps illustrate that.  See, e.g., In re Nichols, 223 B.R. 353,

356, 359-362 (Bankr. N.D. Okla. 1998) (chapter 11 case dismissed
for bad faith when, inter alia, debtor filed to avoid
incarceration for violating state court divorce proceeding
orders, there was no pressure from other creditors, and there was
no prospect of reorganization without resolution of divorce
proceedings).  But if there were any doubt, one need only
consider the statement of Debtor's counsel that "this is a one
creditor case. You know, it's not like there are other
significant creditors out there.  This is just a Dooleys against
Hyatt in Bankruptcy Court, 15-rounder, at this point."
Transcript for November 28, 2011 hearing in Dooley v.Hyatt,
Adversary Proceeding 11-1095, p. 8, line 24 through p. 9, line
2.[13]

In fact, the case is not entirely a two-party dispute.  For
example, Debtor has guarantied the debts of a number of the
related corporations and LLCs, but those other entities appear to
have the wherewithal, including the collateral value, to repay
their obligations.  More important, Debtor also has a
longstanding debt to June Cochrell for about $90,000, although as
noted the historical repayment of that obligation has been
agreeably leisurely.  Nevertheless Ms. Cochrell decidedly risks

---

[13] A copy of the transcript is attached to the Motion.

Page 23 of  41

not getting repaid if the case is dismissed.[14]  Admittedly, even if the case continues in its chapter 11 DIP status or is converted, she may not be repaid in full, but her chances of at least partial payment are greater than if the case is dismissed.

Those facts are sufficiently distinct from, for example, Muskogee Environmental Conservation Company, 236 B.R. 57.  In that case, the chapter 11 debtor had sustained a state court judgment against it in connection with its primary asset, a very profitable fly ash disposal contract.  The case was filed to move "a classic two-party dispute" between debtor and the two opposing parties from state court to bankruptcy court; the dispute was based solely on state law. Once in the bankruptcy court, the parties initiated three adversary proceedings and numerous contested matters against each other.  When postpetition, the judgment against the debtor was vacated on appeal in state court proceedings, the parties were basically back to starting the litigation all over.  Debtor filed a plan which had the effect of taking the state court litigation and moving it to the bankruptcy court.  And in a similar vein, debtor had the wherewithal to both obtain a supersedeas bond (and did so, but did not file it), and to satisfy the state court judgment without losing its ability to

---

[14] Schedule F also lists Trestle as a creditor for $290,000, from loans advanced over the previous six years.  The remainder of the unsecured debts are monthly bills for cable and utilities that got caught up in the filing.

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 24 of 41

operate; for example, the debtor accumulated $1,400,000 during the chapter 11 case.

> The question presented by these cases is a simple one. It is whether Chapter 11 of the United States Bankruptcy Code exists for the purpose of allowing a debtor the option of litigating a dispute with a single party (or, in this case, two parties with identical interests) in an alternative forum, when the debtor has no other need of or use for the bankruptcy court. The Court answers the question in the negative.

Id. at 68.

In the instant case, Debtor had no ability to put up a supersedeas bond, had no cornucopia of cash, and has not attempted to move the state court litigation to this Court. His proposed plan (as yet unfiled) appears to contemplate paying all his obligations in full, whatever they may be. This is clearly not a case initiated simply to obtain an alternative forum for litigation. Thus, although the dispute that is the basis for this chapter 11 case is largely though not entirely[15] a two-party dispute, that is not a sufficient basis by itself for dismissing or converting the case.

Debtor candidly admits that he filed this chapter 11 case and the one for Quiet Title because neither debtor was able to post a $3.5 million bond. Dooleys argue that filing a chapter 11

---

[15] As noted, Cochrell is likely to go unpaid, or at best partially unpaid, if there is a wholesale seizure and liquidation of the estate's assets by either the creditors or a chapter 7 trustee. In itself that is a strong argument against dismissal or conversion.

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 25 of 41

case to avoid the need to post the bond is bad faith justifying the conversion or dismissal of the case.

There is Tenth Circuit authority to dismiss a chapter 11 case for a bad faith filing. See generally Udall v. Federal Deposit Insurance Corp. (In re Nursery Land Development, Inc.), 91 F.3d 1414, 1416 (10th Cir. 1996):

> [Case properly dismissed for bad faith when debtor] (1) has only one asset; (2) has only one creditor; (3) acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure; (4) was revitalized on the eve of foreclosure to acquire the insolvent property; (5) has no ongoing business or employees; and (6) lacks a reasonable possibility of reorganization, and (7) the Chapter 11 filing stopped the foreclosure.

See also In re Nichols, 223 B.R. at 356, 359-362 (chapter 11 case dismissed for bad faith when, inter alia, debtor filed to avoid incarceration for violating state court divorce proceeding orders, there was no pressure from other creditors, and there was no prospect of reorganization without resolution of divorce proceedings).

But more specifically there is conflicting authority about whether the mere act of filing a bankruptcy case to avoid the need to post a supersedeas bond is per se bad faith. Compare, e.g., In re Wally Findlay Galleries (New York), Inc., 36 B.R. 849, 851 (Bankr. S.D. N.Y. 1984) (Debtor filed chapter 11 case in face of ejectment action following grant of summary judgment against it in state court:

Page 26 of  41

> Neither the debtor, the Borynack Corporation, nor Mr.
> Borynack has sufficient assets to post a bond in order
> to stay these judgements pending appeal.  The debtor
> filed its petition herein to avoid the consequences of
> adverse state court decisions while it continues
> litigating.  The court should not, and will not, act as
> a substitute for a supersedeas bond of state court
> proceedings.
> . . .
> The debtor is unable to propose a meaningful plan of
> reorganization until its litigation with International
> and Realty is resolved.  Thus, it is evident that the
> debtor seeks to use this court not to reorganize, but
> to relitigate.  This is an impermissible use of Chapter
> 11 of the Bankruptcy Code.  Consequently, the above
> captioned petition must be dismissed.

and In re Smith, 58 B.R. 448 (Bankr. W.D. Kan. 1984) (it is an

abuse of state and federal law for a solvent judgment debtor with

one (judgment) creditor to use chapter 11 as a substitute for

posting a supersedeas bond); In re Karum Group, Inc., 66 B.R.

436, 438 (Bankr. W.D. Wash. 1986) (debtor would not be insolvent

but for judgment; improper to use chapter 11 as substitute for

supersedeas bond); In re Davis, 93 B.R. 501, 503 (Bankr. S.D.

Texas 1987) (debtor filed to avoid posting supersedeas bond;

chapter 11 petition dismissed because debtor had sufficient

assets to pay judgment and because debtor may have been dishonest

in first meeting of creditors and on schedules); In re Boynton,

184 B.R. 580, 582-84 (Bankr. S.D. Cal. 1995) (Debtor had assets

to put up supersedeas bond for, and to pay, Tax Court judgment;

assets were largely liquid in investment account, and debtor did

not operate a business but filed only to stay enforcement of

judgment to be able to appeal; dismissal appropriate in this

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 27 of 41

largely two-party case where no permissible bankruptcy purpose is being served); Marsch v. Marsch (In re Marsch), 36 F.3d 825, 827-29 (9th Cir. 1994) (chapter 11 case dismissed on finding that petition was filed solely to delay collection of restitution judgment and to avoid posting an appeal bond; bankruptcy court found that debtor could satisfy judgment with nonbusiness assets; court refrained from ruling on whether petition could be dismissed for bad faith if debtor did not have sufficient assets to post a supersedeas bond); In re Primary Health Services, Inc., 227 B.R. 479, 485-86 (Bankr. N.D. Ohio 1998) (but for post-judgment transfers, debtor would have been able to post supersedeas bond; debtor also manufactured for itself cash flow problems and engaged in a continuous course of deception); Epic Metals Corp. v. Condec (In re Condec), 232 B.R. 806, 809 (M.D. Fla. 1999) (reversing plan confirmation for, inter alia, bad faith filing of chapter 11 case solely to avoid need to file supersedeas bond and plan was not fair and equitable to the one truly impaired creditor); In re SGL Carbon Corporation, 200 F.3d 154, 163-67 (3rd Cir. 1999) (completely solvent chapter 11 debtor filed to aid in extracting a favorable settlement and not for any valid reorganizational purpose; proposed plan treated the judgment creditor substantially differently than other creditors who were to be paid full amount of claims in cash); Chu v. Syntron Bioresearch, Inc. (In re Chu), 253 B.R. 92, 95-96 (S.D.

Cal. 2000) (dismissing chapter 11 case when debtor had ability to file a supersedeas bond, could not propose a confirmable plan of reorganization, and claimed assets and liabilities that suddenly appeared without explanation; debtor sought to use chapter 11 to delay and collaterally attack state court judgment);

> The test of good faith is whether a debtor is
> attempting to unreasonably deter and harass creditors
> or attempting to affect a speedy, efficient
> reorganization on a feasible basis. The overall goal
> of the good faith requirement is to deter filings that
> seek to achieve objectives outside the legitimate scope
> of the bankruptcy laws.

Id. at 95 (citing In re Marsch, 36 F.3d at 828; internal punctuation omitted); In re Paolini, 312 B.R. at 307; In re Sydnor, 431 B.R. at 594, 596; c.f. Harker v. United States (chapter 13 petition filed to avoid assessment by IRS, which was the only creditor, and to avoid filing of supersedeas bond; bankruptcy court's finding that this use of chapter 13 was inconsistent with fundamental goal of bankruptcy to reorganize debts and so warranted dismissal was not clearly erroneous); with In re Alton Telegraph Printing Co., 14 B.R. at 241 (chapter 11 filing due to inability to post supersedeas bond not bad faith per se); Hillside Plaza Ltd. v. Pomodoro Restaurant (In re Pomodora Restaurant, 251 B.R. 441 (10th Cir. BAP 1999) (unpublished) (listing cases) (stay relief denied and case not dismissed when debtor could not post supersedeas bond and debts substantially exceeded assets; test is to look at all the

circumstances of the case); In re Fox, 232 B.R. 229, 233-36 (Bankr. D. Kan.), appeal dism'd 241 B.R. 224 (10th Cir. BAP (1999) (listing cases and declining to adopt per se rule that filing chapter 11 case in lieu of filing supersedeas bond constitutes bad faith; debtor had timely filed disclosure statement and plan); Marshall v. Marshall (In re Marshall), 403 B.R. 668, 690-94 (C.D. Cal. 2009) (allegedly solvent debtors lacked resources to put up supersedeas bond and filed petition shortly after being ordered by Texas state court to turn over assets; although schedules prepared by debtors were not "exactly right" and debtors lacked many unsecured creditors or much unsecured debt other than that of the judgment creditor, denial of motion to dismiss chapter 11 case affirmed); see also In re Glunk, 342 B.R. 717 Bankr. E.D. Pa. 2006) (court refused to dismiss chapter 7 case filed by physician to address one primary claim of malpractice, while continuing to live a lavish lifestyle); Rocco v. King (In re King), 2008 WL 8444814 (9th Cir. BAP) (unpublished) (court refused to dismiss chapter 13 case filed in lieu of posting supersedeas bond; debtor had filed plan which proposed 100% payment to all creditors).

To begin with, "[f]iling a chapter 11 case because of the crushing weight of a judgment is not unusual." In re Marshall, 403 B.R. at 690 (citations omitted). "Giving debtors the opportunity to reorganize in response to impending financial

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 30 of 41

distress is the purpose of chapter 11.  The fact that this
financial distress was brought on by litigation rather than
borrowing is not dispositive." <u>Id.</u> at 691.  <u>C.f.</u>, <u>In re Texaco
Inc.</u>, 254 B.R. 536, 541 (Bankr. S.D. N.Y. 2000) ("Texaco filed
under Chapter 11 for the sole purpose of compromising a $10.5
billion judgment.").  Given this approach, this Court believes
that the better reasoned cases are those that hold that the mere
filing of a chapter 11 petition to avoid the need to file a
supersedeas bond, relying instead on the automatic stay to
prevent collection activities, is not by itself bad faith or a
reason to convert or dismiss the chapter 11 case.

But as the cases also make clear, filing a chapter 11
petition obligates the filer to proceed with the chapter 11 in
good faith, including taking those actions to fulfil the purpose
of a chapter 11 case.  That will ordinarily include filing a
confirmable plan and disclosure statement and then timely
confirming the plan.  <u>E.g.</u>, <u>In re Sparkle Stor - All Eaton
Township, LLC</u>:

> Both subparts (b)(4)(J) and (b)(4)(E) in turn seem
> reasonably construed to include not only the
> requirement that filing deadlines and court orders be
> met, but that they be met with documents and actions
> that substantially comply with the statute and the
> directives of the court, thus placing the case in a
> reasonable posture to move forward toward
> reorganization. Debtors' most recent proposed form of
> plan and disclosure statement do not place the case in
> that posture, as they remain fundamentally flawed and
> lacking substantial compliance with §§ 1122 and 1129.

2011 WL 4542709 at *4; c.f., In re 266 Washington Associates, 141 B.R. at 281 ("However, restraining creditors from enforcing their legitimate rights is strong medicine and our bankruptcy laws do not sanction the stay for stay's sake."  Case dismissed because no effective reorganization was in prospect, citing United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 375-76 (1988)).

In this case Debtor filed a plan and disclosure statement on the 120th day following the filing of the petition.  That of course precluded any other person, including Dooleys, from filing a plan for another sixty days.  § 1121(c)(2) and (3).  But then Debtor took no further steps to complete the confirmation process.  In response to the Court's question during closing argument about whether Debtor had not largely "parked" the chapter 11 case to await the outcome of the state court appeal, Debtor's counsel insisted the case had been very active, pointing out that Debtor had not only timely performed various duties imposed by the Code but also had spent nine months resisting a non-dischargeability action from the Dooleys.  When the Court asked when an amended plan could be filed, Debtor's counsel estimated sixty days.  This estimate was in the context of counsel's other estimate that a decision from the New Mexico Court of Appeals was certainly possible by January 2013.  Thus, a plan filed around the beginning of October, assuming at least one

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 32 of 41

one-month delay for a disclosure statement dispute, could easily come up for a confirmation hearing in January 2013 as well. That would accomplish Debtor's transparent goal of getting an appellate decision on the judgment without any collection action in the interim and without a supersedeas bond. The Court notes also that in response to the sixty-day estimate, the Court told counsel that sixty days was too long, yet even now, approximately 7 ½ weeks following oral argument, Debtor has still not filed an amended plan.

Debtor's position on the filing of a plan, evidenced by its conduct in this chapter 11 case, is that he wants and needs to obtain an appellate review, and a reversal, of the jury verdict, in order to provide some certainty for purposes of a plan. However, the decision by the Court of Appeals will not inevitably end the litigation. Depending on the outcome, either party will be entitled to ask the New Mexico Supreme Court to review the decision of the Court of Appeals. Alternatively, the Court of Appeals may remand for another trial. In short, the state court litigation could continue for years, even though all of the discussion on this issue has focused only on the upcoming decision by the Court of Appeals. Neither side has stated a position on what might happen after the Court of Appeals issues its decision. And it would be unreasonable for Debtor to put off

filing an amended plan until the conclusion of all the
litigation.

Thus Debtor is faced with submitting a plan that takes into
account that uncertainty.  Whether such a plan provides
alternative dispositions of the assets depending on the outcome
of the litigation, or seeks in effect to compromise the HDQ
claim, or in effect concedes that the HDQ claim is treated in the
full amount of the judgment, is not at issue at this time, of
course.  It suffices that plans with alternative treatment of
claims are frequently filed.

As the case law makes clear, filing and confirming a plan
are at the heart of a debtor in possession's reorganization.

> "Confirmation of a plan of reorganization is the
> statutory goal of every chapter 11 case.  Section 1129
> provides the requirements for such confirmation,
> containing Congress' minimum requirements for allowing
> an entity to discharge its unpaid debts and continue
> its operations." 7 Collier on Bankruptcy ¶ 1129.01, p.
> 1129-10 (rev. 15th ed.1998).

Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle
Street Partnership, 526 U.S. 434, 465 n. 4 (Stevens, J.,
dissenting); Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 470-
71 (1974); ARS Analytical, 433 B.R. at 862; see Nursery Land
Development, 91 F.3d at 1416 and Nichols, 223 B.R. at 359 (one
bad faith factor is lack of ability to reorganize).  The
structural importance of the plan in a chapter 11 case is further
reflected in § 1112(b)(2)(A), which conditions a finding of

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 34 of 41

"unusual circumstances" on, inter alia, "a reasonable likelihood
that a plan will be confirmed . . . within a reasonable period of
time. . . ."  Indeed, the failure to confirm a plan timely has a
particularly pernicious effect on a DIP chapter 11 case.  That is
because, unlike almost any other "cause" specified in §
1112(b)(4), the failure to file and confirm a plan within a
reasonable time period not only constitutes cause to trigger
dismissal or conversion, but filing and confirmation are also
prerequisites for obtaining the exception to conversion or
dismissal.  In other words, failure to file and confirm a plan
timely triggers conversion or dismissal and also precludes use of
the one way to avoid conversion or dismissal.  As with a finding
of § 1112(b)(4)(A) cause – substantial and continuing loss or
diminution of the estate and no reasonable prospect of
rehabilitation – a finding of cause for failure to confirm a plan
timely has this two-fold "unforgiveable sin" effect.

     Thus the Court finds that Debtor's attempted manipulation of
the chapter 11 process – the filing without moving forward in
good faith to confirm and implement a plan – should constitute
bad faith and "cause" under § 1112(b)(4) sufficient to trigger
the consequences of § 1112(b)(1).  In re Ashley Oaks Development
Corp., 458 B.R. at 287 (failure to file plan timely as required
by local rule, coupled with continuing losses and no prospect of
reorganization, results in dismissal); In re Van Eck, 425 B.R.

54, 63-64 (Bankr. D. Conn. 2010) (debtor filed plan without disclosure statement 18 months into the case and on day of hearing on motion to dismiss; case dismissed). And that behavior would constitute cause but for the fact that § 1112(b)(4)(J) specifically addresses deadlines for filing a plan.

That subsection specifically addresses when a plan must be filed. As noted above, Debtor has not missed any deadline for filing a plan, and therefore there is no cause to dismiss or convert pursuant to that subsection. With Congress having explicitly addressed when not filing a plan constitutes cause for dismissal or conversion, the Court should not in effect modify § 1112(b)(4)(J) by adding a deadline under the guise of "bad faith". This conclusion gives effect to the statutory canon of interpretation that "inclusio unius est exclusion alterius", despite the fact that the sixteen instances of cause listed in § 1112(b)(4) are not exclusive. See also Radlax Gateway Hotel, LLC v. Amalgamated Bank, ___ U.S. ___, 123 S.Ct. 2065, 2070-73 (2012) (commonplace canon of statutory interpretation, that the specific governs the general, required debtor's chapter 11 plan to permit the secured creditor to credit bid at the sale of the collateral pursuant to § 1129(b)(2)(A)(ii) (incorporating credit bidding rights of § 363(k)) rather than no credit bidding by invoking the

Case 11-10973-j7   Doc 122   Filed 09/26/12   Entered 09/26/12 16:03:36 Page 36 of 41

more general standard of indubitable equivalence of §
1129(b)(2)(A)(iii)).[16]

In consequence, the Court cannot dismiss or convert this
chapter 11 case, nor appoint a chapter 11 trustee, at least
pursuant to § 1112(b). The Court will therefore deny the Motion
without prejudice.

However, this denial of the Motion is in effect, albeit not
literally, conditional[17]: Debtor must file a reasonably
confirmable amended plan and accompanying disclosure statement,
and have noticed out that plan and disclosure statement, and
obtain a hearing on any objections to the disclosure statement,
no later than Wednesday, October 10, 2012.[18] Debtor's failure to
meet this deadline will constitute cause pursuant to § 1112(b)(4)

---

[16] This interpretation follows from the plain language of
the statute, it does not use an alternative and perhaps non-
obvious ground to in effect modify the statute, and it has the
additional advantage of allowing a common-sense reading of the
statute to provide a reasonable assurance about what it takes to
comply with the statute.

[17] See Orbit Petroleum, 395 B.R. at 149 (denying motion
conditioned on debtor confirming plan; failure to confirm would
result in order of dismissal); In re Melendez Concrete Inc., 2009
WL 2997920 at *7 (Bankr. D.N.M. 2009) (debtor allowed to attempt
to confirm a plan conditioned on filing a plan and disclosure
statement timely, obtaining insurance for property, refiling
defective MORs, and other requirements).

[18] Since Debtor's counsel stated that he could have a plan
on file within sixty days of August 2, a deadline of October 8
provides Debtor an additional nine days for filing the plan. The
Court assumes that Debtor and counsel have not ignored the
Court's comments made during oral argument.

sufficient to trigger the consequences of § 1112(b)(1) without the need for any further evidentiary hearing.  In that circumstance, the Court will conduct oral argument on Wednesday, October 17, 2012, at 1.30 pm (Mountain Daylight Time), in the Animas Courtroom, 13th Floor, 500 Gold S.W., Albuquerque, New Mexico 87102, to consider what the evidence showed concerning "unusual circumstances" and what remedy is most appropriate among the choices of dismissal, conversion or appointment of a chapter 11 trustee.  The parties should be prepared to address the question of whether the "unusual circumstances" test is applicable if the Court decides to appoint a chapter 11 trustee, as opposed to dismissing or converting the case, in light of the lack of a reference to the appointment of a chapter 11 trustee in § 1112(b)(1) but not in § 1112(b)(2).  The parties, and Debtor in particular, should also be prepared to address the consequences and ramifications of the appointment of a chapter 11 trustee[19],

---

[19] See, e.g., Margaret Howard, Bankruptcy Bondage, 2009 U. Ill. L. Rev. 191, 192:

> Under the 2005 Amendments, an individual debtor may be put into a chapter 11 proceeding involuntarily, and required to make payments under a plan proposed by creditors out of future income. During consideration of the 1978 Bankruptcy Code, Congress thought that similar provisions proposed for chapter 13 raised problems under the Thirteenth Amendment.  We now, however, have the very statutory configuration that was rejected at that time, partly on constitutional grounds.  Now that these provisions are part of the law, full discussion of the Thirteenth Amendment's possible application is timely.

(continued...)

since the appointment of a chapter 11 trustee might comport best with the dictate of § 1112(b)(1) for a disposition that is in the "best interests of the creditors and the estate [but not necessarily of the debtor]."[20]  Of course, if Debtor files and notices out the amended plan and disclosure statement timely,

_____

[19](...continued)
(footnotes omitted); In re Clemente, 409 B.R. 288 (Bankr. D. N.J. 2009) (debtor in trusteed chapter 11 case moved to convert his case to chapter 7; court treated motion as request to terminate chapter 11 trustee for limited purpose of converting case to chapter 7 in order to avoid constitutional issue of involuntary servitude); Misuraca v. United States Trustee, 2009 WL 1212471 (D. Ariz.) (claim that chapter 11 provision to pay future wages to trustee is unconstitutional not ripe for judicial determination).

[20] Prior to the enactment of BAPCPA, the statute permitted but did not require the Court to convert or dismiss if it found cause; the Court's discretion has now been considerably albeit not entirely removed.  See Orbit Petroleum, 395 B.R. at 147; In re Miell, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009).  The wider discretion was consistent with the dual chapter 11 purposes of reorganization by the debtor to preserve or increase value and to pay creditors.  See United States v. Whiting Pools, Inc., 462 U.S. 198, 203 (1983).  After BAPCPA, if the debtor has failed to file MORs timely, pay postpetition taxes, pay United States Trustee fees, etc., all of which might be easily curable, the debtor in possession may still lose control, or have the case dismissed, even if the creditors wish otherwise, because the circumstances at issue have to be "unusual"; that is, "circumstances [that] cannot solely be facts that are common to Chapter 11 cases generally." Sydnor, 431 B.R. at 591 (citation omitted); In re Pittsfield Weaving, 393 B.R. 271, 274 (Bankr. D. N.H. 2008) ("the phrase ["unusual circumstances"] contemplates conditions that are not common in chapter 11 cases.  Citation omitted.).  In other words, by taking away the flexibility to continue a case in its chapter 11 DIP status except in "unusual circumstances", Congress has elevated punishment for a debtor's misbehavior or even only missteps over payment to creditors.

there will be no hearing on conversion, dismissal or appointment

of a chapter 11 trustee.

     An order will issue.

_Honorable James S. Starzynski_
Honorable James S. Starzynski
United States Bankruptcy Judge

Date entered on docket: September 26, 2012

Copies to:

Citibank, N.A.
701 East 60th Street North
SIOUX FALLS, SD 57117

Citibank, N.A.
Payment Center, 4740 121st St.
Urbandale, IA 50323

Christie B Cochrell
c/o Thomas G Rice
8608 Greenarbor Rd NE
Albuquerque, NM 87122

Charles Dickey, Jr.
PO Box 93427
Albuquerque, NM 87199

Cornelius Dooley
Susanne Dooley-Hoffman
c/o Aletheia Vadin Pamela
Allen
Arland & Associates LLC
201 Third St NW Ste 505
Albuquerque, NM 87102

William J Arland, III
PO Box 1089
Santa Fe, NM 87504-1357

Duquque Bank and Trust
c/o Peggy A Whitmore
Castle Stawiarski, LLC
20 First Plaza NW, Suite 602
Albuquerque, NM 87102

Farm Credit of New Mexico,
FLCA,
a wholly owned subsidiary of
Farm Credit of New Mexico, ACA
c/o Michelle Ostrye
PO Box 1945
Albuquerque, NM 87103-1945

HDQ, LLC
c/o  Kelcey C Nichols
The Simons Firm, LLP
PO Box 5333
Santa Fe, NM 87502

HDQ, LLC
Thomas D Walker
500 Marquette Ave NW Ste 650
Albuquerque, NM 87102-5309

Joe Michael Hyatt
c/o Clifford C Gramer, Jr
3733 Eubank Blvd NE
Albuquerque, NM 87111-3536

New Mexico Bank & Trust
c/o Francis J Mathew
PO Box 23945
2011 Botulph, Ste 200
Santa Fe, NM 87502-3945

Page 40 of  41

Quiet Title Co., LLC
c/o George M Moore
Moore, Berkson & Gandarilla,
P.C.
PO Box 7459
Albuquerque, NM 87194

U.S. Bank, National
Association, as Trustee for
the Certificateholders of the
SARM 2006-1 Trust Fund
c/o Karen H Bradley
PO Box 3509
Albuquerque, NM 87190-3509